UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
JULIUS H. SCHOEPS, BRITT-MARIE        :
ENHOERNING, and FLORENCE VON          :        13 Civ. 2048 (JSR)
KESSELSTATT,                          :
                                      :        OPINION AND ORDER
        Plaintiffs,                   :
                                      :
        -v-                           :
                                      :
FREISTAAT BAYERN, or FREE STATE OF    :
BAVARIA, A STATE OF THE FEDERAL       :
REPUBLIC OF GERMANY,                  :
                                      :
        Defendant,                    :
                                      :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

        On March 27, 2013, plaintiffs Julius H. Schoeps, Britt-Marie

Enhoerning, and Florence Von Kesselstatt, heirs of the late Jewish

banker Paul von Mendelssohn-Bartholdy, commenced this action against

the German State of Bavaria to recover a painting by the legendary

artist Pablo Picasso entitled *Madame Soler*. Previously owned by

Mendelssohn-Bartholdy, *Madame Soler* was the subject in 1934 Berlin

of an alleged forced transfer under the then-Nazi regime, and after

another change in custody, now resides in a Munich museum under the

custody of Bavaria. Second Amended Complaint ("Am. Compl.") ¶¶ 1-2.[1]

        Following commencement of this action, defendant Bavaria

brought a motion pursuant to the Federal Rules of Civil Procedure

12(b)(1) to dismiss this action for lack of subject matter

---

[1] On October 17, 2011, the Bavarian State Painting Collection
"reject[ed] the demand for restitution made by the heirs to
Mendelsoohn-Bartholdy." Plaintiff's hearing exhibit ("Pl. Ex.") 98.

jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §
1605(a)(2) ("FSIA"). The FSIA "provides the sole basis for obtaining
jurisdiction over a foreign state in the courts of this country."
*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443
(1989). Section 1605(a)(2) of the FSIA provides for jurisdiction
over a foreign state in three instances: (1) where a plaintiff's
claim is "based upon" "a commercial activity carried on in the
United States by the foreign state"; (2) where a plaintiff's claim
is "based upon" "an act performed in the United States in connection
with a commercial activity of the foreign state elsewhere"; or (3)
where "an act outside the territory of the United States in
connection with a commercial activity of the foreign state elsewhere
causes a direct effect in the United States." 28 U.S.C. §
1605(a)(2).

After initial briefing and oral argument on December 23, 2014,
the Court determined that an evidentiary hearing was required. That
hearing was held on two dates, February 28, 2014 and March 18, 2014,
after which the Court received post-hearing supplemental briefing.
In what follows below, the Court has made factual findings where the
evidentiary hearing gave it a basis for so doing, and has otherwise
taken the facts most favorably to the plaintiffs.

According to the Amended Complaint ("Am. Compl."), in 1934 the
late Jewish banker, Mendelssohn-Bartholdy, after nearly two years of
"intensifying Nazi persecution had devastated him financially,
professionally, and socially," consigned *Madame Soler* to the Berlin

2

art dealer Justin K. Thannhauser, in what was allegedly a "paradigmatic forced transfer." Am. Compl. ¶¶ 1-2. Thirty years later, *Madame Soler* remained in the custody of Thannhauser, who had by then relocated to New York. *See, e.g.*, Am. Compl. ¶ 4.

In October of 1963, Kurt Martin, the then-Director General of the State Paintings Collections Munich ("State Paintings Collection"), an organization operating under the auspices of the Bavarian State Ministry for Education and Cultural Affairs, *see* Pl. Ex. 47., sent a letter to the Bavarian State Ministry for Education and Culture, seeking approval for a trip to the United States by Halldor Soehner, a Senior Curator in the department of "17th and 18th Century Spanish and French Paintings," *see* Pl. Ex. 33. The purpose of the trip, according to the letter, was so that Soehner, who was likely the heir apparent to Martin, could become "familiar with the most modern methods of museum organization . . . the systemization of scholarly and public education work, the administration of museums, the security measures, the purchase and so forth [of artworks] . . . ." Pl. Ex. 40 (alteration in the original). On January 10, 1964, Martin's permission for Soehner's requested trip "to study museums in the USA" was granted by the Bavarian State Ministry for Education and Cultural Affairs, with the caveat that "[a] leave of absence beyond 3 months is not possible in light of the imminent change in the leadership of the State Paintings Collections." Pl. Ex. 41. On March 30, 1964, Soehner, as

Senior Curator, and soon to be Director General of the State Paintings Collections, departed for the United States. Pl. Ex. 43.

The evidence shows that at some point after March but before the end of May 1964, Soehner signed Thannhauser's guestbook in Thannhauser's residence on the Upper East Side of New York, where the two men met and, most likely, Soehner saw *Madame Soler*. Pl. Ex. 44. After returning back to Germany on June 12, 1964, Pl. Ex. 46, Soehner wrote a letter to Thannhauser on July 1, 1964, in which following some fulsome flattery, he states: "[t]oday I entered upon my new position [as Director General], and my first action is this letter to you," and "I would be particularly grateful if you would give me the opportunity to visit you around the first of August." *Id.* While this might have suggested a second trip to New York, actually Soehner was planning to meet Thannhauser in Europe. Thus, on July 22, 1964, Soehner, wrote to the Bavarian State Ministry for Education and Cultural Affairs, declaring that "it has become a matter of urgency for me to take an official trip to St. Jean, Cap Ferrat, France, where important negotiations with the art trade there concerning future purchases for the Bavarian State Paintings Collections are to be conducted." Pl. Ex. 49. On July 23, 1964, in anticipation of such approval, Soehner wrote to Thannhauser stating "[o]ur original plan to meet at the beginning of the month of August can now be realized." Pl. Ex. 50. On July 29, 1964, the Bavarian Ministry officially approved Soehner's trip to France, granting "approval for the official trip of the Director General of the State

Paintings Collections Dr. Halldor Soehner to St. Jean, Cap Ferrat,
France to conduct negotiations with the art trade there in the first
week of the month of August 1964." Defendant's hearing exhibit
("Def. Ex.") 31.

This phase of the correspondence culminates with a Letter
Agreement between Thannhauser and Soehner on August 3, 1964 in
"Saint-Jean-Cap-Ferrat," in which Thannhauser dictates, on "Hotel
Intercontinental Geneve" letterhead, "I hereby confirm the purchase
of the oil painting 'Madame Soler' by Pablo Picasso by the Bavarian
State Paintings Collections, Munich, from myself as commission
agent. The Purchase price is 1,775,000.00 Swiss Francs . . . the
full amount should be paid by August 31, 1965." Def. Ex. 32. The
Letter Agreement adds the caveat that "[t]his acquisition is subject
to the proviso of consent of the Bavarian State Ministry of
Education and Cultural Affairs and the consent of the Purchase
Commission for Modern Art with the Bavarian State Paintings
Collections in Munich." Id.

Given this factual record, plaintiffs now concede that their
original theory that jurisdiction in this Court could be premised on
Soehner and Thannhauser reaching a binding agreement regarding the
sale of Madame Soler in their Spring 1964 meeting in New York can no
longer prevail. March 18, 2014 Transcript ("Tr.") at 370:18-23.
Indeed, the Court finds that Soehner and Thannhauser did not reach
any kind of agreement during the Spring 1964 visit in New York. The
Court further determines that Soehner took no concrete action toward

5

the purchase of *Madame Soler* until after he returned to Germany and took office as Director General in July of 1964.

The Court infers that one reason the Letter Agreement was signed in Europe was Thannhauser's desire to avoid U.S. taxes on the sale. Thus it appears that before final approval of the sale was given by the Bavarian Ministry of Education and Cultural Affairs." Thannhauser – in response to Soehner's request on October 8, 1964 that Thannhauser send a letter to the Bavarian Ministry of Education and Cultural Affairs "communicating willing[ness] to sell" *Madame Soler* "from your collection to the museums in Munich," *id.* – stated that "[t]he paintings are located in Switzerland" and "will be sent to you from there, upon advanced payment of the expenses." Def. Ex. 36.

Further evidence of Thannhauser's tax avoidance motive came on October 23, 1964, when the Picasso painting was sent by the entity "EBA, Vaduz," a Liechtenstein entity controlled by Thannhauser, Pl. Ex. 26, to the Bavarian State Paintings Collections in Munich, Def. Ex. 38, with a letter from EBA informing Soehner of the shipment and asking for confirmation of receipt, Pl. Ex. 58. Final approval of the sale by the Bavarian State Ministry of Culture and Education did not, however, occur until December 1964. Def. Ex. 53, 50. Thereafter, on April 10, 1965, Soehner wrote to Thannhauser that payment would be made to EBA "as requested," Def. Ex. 59, and on June 1, 1965, it was "EBA" that wrote to Soehner acknowledging receipt of payment for *Madame Soler*. Def. Ex. 62.

Based on these findings, the Court concludes that jurisdiction over the State of Bavaria does not lie in this action under any of the three exceptions enumerated in the FSIA § 1605(a)(2). The Court considers each of these exceptions in turn:

Under the first prong of FSIA § 1605(a)(2), plaintiffs' suit must be "[1] 'based upon' [2] some 'commercial activity' by [Bavaria] that had 'substantial contact' with the United States." *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993). In no real sense is this suit even "based upon" Bavaria's acquisition of *Madame Soler* in 1964-65, let alone activity in the United States. Rather, as the "Nature of Action" section of the Amended Complaint makes clear, the gravamen of this action is that title to *Madame Soler* never rightfully passed to Thannhauser in Germany because "Mendelssohn-Bartholdy consigned the Painting (to Thannhauser) in 1934 only after nearly two years of intensifying Nazi persecution," Am. Compl. ¶ 2. *See also* Am. Compl. ¶¶ 70-176. Thus, if this action were to ever reach the merits, the focus of the case would be almost exclusively on the circumstances of Mendelssohn-Bartholdy's original sale to Thannhauser in Europe in the 1930's.

To be sure, Bavaria would not be the defendant in the case but for the fact that Bavaria purchased the painting from Thannhauser in 1964. But such "but for" reasoning is insufficient to satisfy the "based upon" requirement. *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000). Rather, "'based upon' requires a degree of closeness between the

acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements." *Id.* (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 357-58 (1993)); *see also Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 156 (2007). The blot on Bavaria's title to *Madame Soler*, if there is one, is entirely based on what occurred in Germany in 1934.

Plaintiffs respond by contending that in allegedly "obtaining . . . in [New York] a legally binding offer" to sell *Madame Soler* to Bavaria, Bavaria committed an integral element of conversion under New York law. Plaintiffs' post-hearing brief at 7 (emphasis omitted). *See also Meese v. Miller*, 79 A.D. 2d 237, 436 N.Y.S.2d 496 (4th Dep't 1981) ("Conversion is any unauthorized exercise of dominion of control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right."). Plaintiffs further contend that commercial activity that establishes even *one* part of a single element of a claim is sufficient to satisfy the "based upon" requirement of FSIA § 1605(a)(2).

But even assuming *arguendo* that any of these dubious legal contentions is correct, the argument is factually flawed. For as the Court has already found, there was no legally binding offer to purchase *Madame Soler* made at any time in New York. Indeed, there was nothing more than an initial meeting between Thannhauser and Soehner at which, at most, there was simply an agreement to talk

8

further. Moreover, even if there had been more, Soehner was not yet

Director General at the time he visited Thannhauser in New York, and

he lacked even apparent authority to make any binding offer.

For similar reasons, even if, contrary to fact, plaintiffs

could satisfy the "based upon" requirement of the first exception

under § 1605(a)(2), they would still fail to satisfy the further

requirement that the events detailed above qualify as "commercial

activity carried on by [Bavaria] having substantial contact with the

United States." The "substantial contact" inquiry focuses on what

*Bavaria did* in the United States. *See, e.g.*, *Santos v. Compagnie

Nationale Air France*, 934 F.2d 890, 893 n.3 (7th Cir. 1991). Thus

the fact that Thannhauser was a United States resident is wholly

irrelevant to the Court's sovereign immunity determination under the

first prong of § 1605(a)(2). As has already been made clear, the

evidence establishes that the only activity conducted by Bavaria *in*

the United States in connection with its acquisition of *Madame Soler*

consisted of Soehner's preliminary meeting with Thannhauser in the

spring of 1964, a meeting of no legal consequence, which took place

months before the occurrence of all the pertinent events – the

drafting a letter agreement in France, the shipment of the painting

from Vaduz to Munich, the approval of the acquisition in Munich, and

the payment for the painting to EBA in Liechtenstein – all of which

occurred in Europe. And even if, contrary to the evidence, a bargain

for *Madame* Soler had been vetted at the initial New York meeting, an

individual preliminary meeting cannot and does not by itself

constitute commercial activity "having substantial conduct with the United States" under FSIA §§ 1605(a)(2) and 1603(e). *See, e.g., Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1383-84 (8th Cir. 1993) (finding that a single preliminary meeting in Minnesota in connection with a corporate acquisition in Canada, even when coupled with subsequent exchanges of letters, faxes, and telephone calls in the United States, did not satisfy the requirements of the FSIA).

To support jurisdiction under the second prong of FSIA § 1605(a)(2), plaintiffs' case must be "[1] based . . . upon [2] an act performed in the United States in connection with a commercial activity of [Bavaria] elsewhere." *Kensington*, 505 F.3d at 157. This prong "is generally understood to apply to non-commercial acts in the United States that relate to commercial acts abroad." *Id.* (internal quotation and citation omitted). Where, as here, the plaintiff "has not argued that any *non-commercial acts* performed by [Bavaria] in the United States allegedly formed the basis of its complaint," the second prong is simply "inapplicable." *Id.* (emphasis in original).

Finally, the Court does not have jurisdiction over Bavaria under the third prong of FSIA § 1065(a)(2). This third prong "contains two requirements: (1) there must be an act outside the United States in connection with a commercial activity of [Bavaria] that cause[d] a direct effect in the United States and (2) [plaintiffs'] suit must be based upon that act." *Transatlantic*, 204 F.3d at 388 (2d Cir. 2000). In a vain attempt to satisfy this

requirement, plaintiffs posit that Bavaria's purchase of *Madame Soler* even if occurring (as this Court has found) entirely outside the United States, had a supposed series of allegedly "direct effects" on the United States, ranging from "the disastrous effect of Bavaria's commercial misconduct on the policy-sensitive NY art market," to the furtherance of an alleged criminal conspiracy to evade United States taxes. *See* Plaintiffs' post-hearing briefing at 9. This is balderdash. While the Second Circuit has held that "[t]here is no requirement that the [direct] effect be substantial," *Servaas, Inc. v. Republic of Iraq*, 2011 WL 454501 at *2 (2d Cir. 2011), neither the alleged impact on the art market nor the alleged tax evasion are direct effects at all. And the other "direct" effects alleged by plaintiffs, such as the alleged act of conversion or the sale of New York property, have already been found by this Court to be factually unsupported.

For the foregoing reasons, this lawsuit is hereby dismissed for lack of jurisdiction. The Clerk of the Court is directed to enter judgment and to close this case.

SO ORDERED.

Dated:    New York, NY
          June 27, 2014                          JED S. RAKOFF, U.S.D.J.